IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TRANSOCEAN OFFSHORE §
DEEPWATER DRILLING INC., §
    Plaintiff, §
 §
v. § CIVIL ACTION NO. 4-17-0123
 §
NOBLE CORPORATION PLC, *et al.*, §
    Defendants. §

# **MEMORANDUM AND ORDER**

This patent case is before the Court on the Motion for Summary Judgment of Non-Infringement ("Motion") [Doc. # 76] filed by Defendant Noble Corporation PLC and related corporate Defendants[1] (collectively, "Noble"). Noble seeks summary judgment that it does not infringe United States Patents No. 6,047,781 ("the '781 Patent"), No. 6,056,071 ("the '071 Patent"), No. 6,068,069 ("the '069 Patent"), and No. 6,058,851 ("the '851 Patent") (collectively, the "Patents-in-Suit"). Plaintiff Transocean Offshore Deepwater Drilling Inc. ("Transocean") filed a Response [Doc. # 81], Noble filed a Reply [Doc. # 83], Transocean filed a Surreply [Doc. # 86], and Noble filed a Response to Transocean's Surreply [Doc. # 86].

---

[1] These entities are Noble Corporation, Noble Drilling Americas LLC, Noble Drilling Exploration Company, Noble Drilling Holding LLC, Noble Drilling Services Inc., Noble Drilling (U.S.) LLC, and Noble Drilling (U.S.) Inc.

The Court has carefully reviewed the full record and the applicable legal authorities. Based on that review, the Motion is **granted in part and denied in part**.

## I. BACKGROUND[2]

As stated in the Memorandum and Order on Claim Construction ("*Markman* Order") [Doc. # 68], the '781 Patent was issued in April 2000 for an invention entitled Multi-Activity Offshore Exploration and/or Development Drilling Method and Apparatus. Asserted Claims 1 and 30 of the '781 Patent are apparatus claims. The related patents, the '071 Patent and the '069 Patent, were issued in May 2000. Claim 8 of the '071 Patent is an apparatus claim, and Claim 37 is a method claim. Asserted Claims 8, 17, and 18 of the '069 Patent are apparatus claims. The '851 Patent was issued in July 2000. Asserted Claims 1 and 10 of the '851 Patent are apparatus claims. Transocean is the owner by assignment of the Patents-in-Suit, which relate to dual-activity drilling rigs or "drillships."

Drilling an offshore well requires constructing a wellhole, or wellbore, in the seabed. To construct the wellbore, the driller on the drilling rig alternates between drilling the actual hole in the seabed, and lining that hole with pipe. The drill bit used to drill the hole is suspended on a "drill string," which is comprised of sections of drill

---

[2] In addition to other cited materials, the "Background" section is based primarily on the Complaint [Doc. # 1], Transocean's Tutorial [Doc. # 45], Noble's Tutorial [Doc. # 46], and prior claim construction opinions involving the Patents-in-Suit.

pipe called "tubular members," "tubular assemblies, "tubular strings," or "tubular stands." The tubular members are usually connected to each other on the drilling rig and then lowered, or "advanced," into the sea. Hoisting equipment is used to lower and raise the tubular members. Specialized hoists can be used on free-floating drilling structures to prevent damage to the drill strings or to the drillship.

Multiple tubular members can be connected and made into "stands" which are added to the drill string as a unit. The stands are preassembled and often stored in areas referred to as "setback envelopes."[3] The stands are retrieved by pipe handlers, which are the equipment that travels on tracks to and from the setback envelopes.

After the initial wellbore is drilled, the drill string is raised back to the surface. "Casing pipe" is then lowered on the drill string to the seabed to line the wellbore and provide structural stability. After the casing is in place, the "blow-out preventer" ("BOP") is lowered onto the top of the wellbore generally by the same process used to lower a string of tubular members. The BOP is comprised of one or more valves installed at the well-head to prevent pressure, or oil and gas, from escaping from the well. For the BOP, the tubular members or "riser pipe" have a large diameter and are

---

[3]   Setback envelopes are areas on or near the vessel's drill floor where tubular stands may be positioned until they are needed. *See* Transocean's Tutorial, p. 15 n. 12.

very heavy. As a result, lowering the BOP is more time-consuming than lowering the drill bit or the casing. Indeed, lowering the BOP may take three days or more.

The term "critical path" in this case refers to the specific sequence of tasks that must be performed to construct the well, and it is used to calculate the length of time well construction is expected to take. Any operation required to construct the well ("drilling activity") will be included in the "critical path." To calculate the expected time for well construction, the times anticipated for each step in the critical path are added together. Operations that are required to construct the well include making up and breaking down the tubular strings ("handling"), transferring those tubular strings or stands, and advancing the tubular members to (and sometimes into) the seabed.

On conventional drillships, there was a single drilling station and, therefore, the lowering of tubular members and casing pipe to the seabed had to be interrupted frequently to add tubular members or joints of casing to the drill string. On early drillships with two stations, there was a drilling station and a separate station for non-drilling tasks such as offline stand building. The second station was not capable of performing drilling activity. The Patents-in-Suit, on the other hand, describe a dual-activity vessel with two drilling stations, each capable of performing drilling activity.

The Patents-in-Suit specifically describe a method and apparatus (with variations) that reduce the amount of time required to construct the well. The dual-

activity drillship described in the Patents-in-Suit have a second station that is also capable of conducting drilling activities, allowing the time necessary for certain of those drilling activities to be removed from the critical path. When drilling activities are removed from the critical path, they are referred to in the Patents-in-Suit as "auxiliary drilling activities," but they remain "drilling activities" nevertheless. For example, as reflected in Figures 10-12 of the Patents-in-Suit, while one station is drilling the wellbore and positioning the casing pipe within the wellbore, the other station is simultaneously advancing the BOP and riser pipe toward the seabed. Once the wellbore drilling is complete and the casing pipe is cemented in the wellbore, the floating assembly is repositioned so that the second station is over the wellbore and can land the BOP and riser pipe on the wellbore. Because landing the BOP and the riser pipe takes longer to complete, the critical path is shortened by the removal of the drilling of the wellbore and the positioning of the casing pipe performed by the first drilling station. *See* Declaration of Charles Jones [Doc. # 76-1], ¶ 24. From the time that the BOP and riser pipe are landed, subsequent drilling operations are conducted only by the second station that has been coupled to the riser pipe.

Transocean alleges that Noble owns and leases various dual-activity drillships for offshore oil drilling operations that infringe the Patents-in-Suit. Noble owns one drillship known as the *Globetrotter*, and owns four additional drillships built by

Hyundai Heavy Industries ("the HHI Drillships"). It is undisputed that each drillship has two stations, which Noble refers to as a "drilling station" and a "preassembly station," respectively.

Noble seeks summary judgment that its drillships are non-infringing. Specifically, Noble seeks summary judgment that its *Globetrotter* Drillship does not infringe method Claim 37 of the '071 Patent, and that none of its drillships infringe Claim 8 of the '071 Patent, Claim 1 or Claim 30 of the '781 Patent, Claims 8, 17 or 18 of the '069 Patent, or Claims 1 and 10 of the '851 Patent.[4] The Motion has been fully briefed and is now ripe for decision.

## II. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "When evaluating a motion for summary judgment, the court views the record evidence through the prism of the evidentiary

---

[4] In its Motion, Noble sought summary judgment of non-infringement of method Claims 15 and 20 of the '781 Patent. In its Response, Transocean advised that it is no longer asserting that Noble infringes these method claims. *See* Response, p. 11 n.5.

standard of proof that would pertain at a trial on the merits." *SRAM Corp. v. AD-II Engineering, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006). Summary judgment on infringement is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Ultimatepointer, L.L.C. v. Nintendo Co., Ltd.*, 816 F.3d 816, 824 (Fed. Cir. 2016).

For apparatus claims, the infringement analysis at the summary judgment stage requires the Court to compare the patent claims as construed with the accused device. *See Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1317 (Fed. Cir. 2016). "All that is required is that the device have the claimed structure, and . . . have the capability of functioning as described by the claim." *Cyris Corp. v. Intel Corp.*, 846 F. Supp. 522, 536 (E.D. Tex. 1994) (citing *Intel Corp. v. U.S. Intern. Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991)).

For method claims, an alleged infringer "must have practiced all steps of the claimed method." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206 (Fed. Cir. 2010); *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1221 (Fed. Cir. 2014) ("the direct infringer must actually perform the steps in the method claim"); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006).

## III. CLAIM 37 OF THE '071 PATENT

Transocean alleges that Noble's *Globetrotter* Drillship infringed method Claim 37 of the '071 Patent when constructing the Swordfish well in the Gulf of Mexico. Transocean does not allege that Noble's HHI Drillships have infringed Claim 37. That claim states:

> A method for conducting offshore drilling operations into the bed of a body of water, for a single well, from a drilling deck operable to be positioned above the surface of the body of water, said method being conducted, at least partially, from a first station for advancing tubular members and at least partially from a second station for advancing tubular members, the method including the steps of:
> (a) advancing a first tubular member extending to the seabed over a wellhole from an interconnected support superstructure;
> (b) advancing a second tubular member, having a distal end extending to the seabed, adjacent to said wellhole from said interconnected support superstructure;
> (c) removing said first tubular member from said well-hole; and
> (d) aligning said distal end of said second tubular member with said wellhole at the seabed for conducting operations auxiliary to said drilling operations using said second tubular member.

Claim 37, '071 Patent. The Court previously construed the preamble for Claim 37 to require that each of the two stations for advancing must perform at least one step of the "method for conducting offshore drilling operations into the seabed." *See Markman* Order, p. 33. Therefore, to avoid summary judgment, Transocean must present evidence that the *Globetrotter* has used each of its two stations to perform at least one of the four steps in Claim 37.

It is undisputed that the preassembly station on the *Globetrotter* does not perform either step (a) or step (c). Therefore, to avoid summary judgment of non-infringement on Claim 37, Transocean must present evidence that the preassembly station on the *Globetrotter* performed either step (b) or step (d).

Step (b) involves "advancing a second tubular member, having a distal end extending to the seabed, adjacent to said wellhole from said interconnected support superstructure." Transocean has presented evidence that the *Globetrotter* advanced the riser pipe (a tubular member) and the BOP to approximately 90 feet above the seabed while the Drillship was in a position approximately 500 feet from the wellhole. Noble argues that the riser pipe and BOP were not advanced "to the seabed" and were not "adjacent to said wellhole."

The Court construed the claim term "to the seabed" to mean "to the point where the item can engage in operations at the seabed." The evidence is undisputed that the preassembly station on the *Globetrotter* Drillship ran the riser pipe and BOP string to a depth of 8,395 feet in 8,487 feet of water. Noble notes that this is approximately 90 feet above the seabed, while Transocean counters that this is 99% of the depth of the water. Transocean has presented evidence that at the uncontested depth, the riser pipe and BOP can engage in operations involved in landing the BOP on the wellhole at the seabed. *See* Second Declaration of John Shaughnessy, Exh. 3 to Surreply, pp. 2-3

(describing landing operations that "started at a water depth of 8,395 feet"), and Figure 1 thereto. The evidence presented by Transocean raises a genuine issue of material fact regarding whether the *Globetrotter* ran the riser pipe and BOP "to the seabed" by advancing the riser pipe and BOP to a point where they could engage in the landing operation of the BOP at the seabed.

The parties agree that the term "adjacent to" in Claim 37 should be construed to mean "near enough to interact with." *See* Joint Agreed Construction [Doc. # 89]. It is undisputed that when the preassembly station lowered the riser pipe and BOP toward the seabed, the *Globetrotter* was located in a "safe zone" approximately 500 feet away from the wellhead. Transocean has presented evidence, however, that at a distance of 500 feet, the *Globetrotter* was near enough for the riser pipe and BOP to interact with the wellhole. Indeed, Transocean has presented evidence that, at a distance of 500 feet, the *Globetrotter* could be physically connected to the wellhole. *See* Second Shaughnessy Decl., p. 3. Transocean's expert explains that "dynamically positioned rigs are often spaced laterally from a point that is directly over the well when running the BOP." *See id.* The rig's position relative to the well is the "Watch Circle," which describes how far the rig can move from a position directly above the well with the riser and BOP attached to the wellhead without needing to disconnect from the well. *See id.* at 3-4. This evidence raises a genuine issue of material fact

regarding whether the preassembly station on the *Globetrotter* lowered the riser pipe and BOP to a position near enough to the wellbore to interact with it for purposes of step (b) of Claim 37.

Step (d) involves "aligning said distal end of said second tubular member with said wellhole at the seabed for conducting operations auxiliary to said drilling operations using said second tubular member." In its Response, Transocean argues that Claim 37 does not require the preassembly station to perform step (d). While this is true, Claim 37 does require the preassembly station to perform one of the four steps completely. As discussed above, it is undisputed that the *Globetrotter* has not performed steps (a) or (c), and there is a genuine issue of material fact regarding whether the *Globetrotter* has performed step (b). Therefore, the Court will address whether Transocean has presented evidence from which a jury could reasonably conclude that the *Globetrotter* has performed step (d).

Transocean argues that Noble's *Globetrotter* Drillship performed step (d) when it transferred the riser pipe connected to the BOP from the preassembly station to the drilling station for purposes of aligning the BOP with, and landing it on, the wellhead. *See* Response, p. 25. The evidence, however, refutes this argument. The uncontroverted evidence in the record demonstrates that the riser pipe and BOP string were transferred from the preassembly station to the drilling station while the *Globetrotter* was located approximately 500 feet away from the wellhole. It was only

after the riser pipe and BOP string were joined and transferred from the preassembly station to the drilling station that the Drillship moved over the wellhole. At that time, ***the drilling station aligned*** the riser pipe and BOP on the wellhead. *See* Swordfish Well IADC Report, MSJ App. [Doc. # 83-1], pp. 576-642. Transocean has failed to present evidence from which a reasonable jury could find that the preassembly station on the *Globetrotter* engaged in aligning the riser pipe with the wellhole as described in step (d) of Claim 37.

It is undisputed that the preassembly station on the *Globetrotter* has not performed steps (a) and (c) of Claim 37, and Transocean has failed to present evidence that raises a genuine issue of material fact in connection with step (d). There is a fact dispute, however, regarding whether the preassembly station on the *Globetrotter* has performed step (b) of Claim 37. Therefore, summary judgment of non-infringement on Claim 37 is **denied**.

### IV.   CLAIM 8 ('071 PATENT), CLAIM 1 ('781 PATENT), AND CLAIMS 7, 17, AND 18 ('069 PATENT)

Noble seeks summary judgment that none of its drillships infringe Claim 8 of the '071 Patent, Claim 1 of the '781 Patent, or Claims 8, 17 or 18 of the '069 Patent. Claim 8 of the '071 Patent includes the limitation:

> wherein drilling activity can be conducted from said interconnected superstructure by said first or second means for advancing and said first or second means for handling tubular members and auxiliary drilling activity can be simultaneously conducted from said interconnected

superstructure by the other of said first or second means for advancing and the other of said first or second means for handling tubular members.

Claim 8, '071 Patent.[5] Claim 1 of the '781 Patent contains a similar limitation, except the drilling activity is conducted from "said derrick" instead of from "said interconnected superstructure." *See* Claim 1, '781 Patent. Claim 8 of the '069 Patent contains a similar limitation, except that the drilling activity is conducted from "said unitary derrick." *See* Claim 8, '069 Patent.[6] Claims 17 and 18 of the '069 Patent include the limitation:

> wherein drilling activity can be conducted for the well from said drilling superstructure by said first or second tubular advancing stations and auxiliary drilling activity can be simultaneously conducted for the well from said drilling superstructure by the other of said first or second tubular advancing stations.

Claim 17, '069 Patent.[7]

Based on the language of the relevant patent claims, an infringing apparatus must have two separate stations, each capable of conducting drilling activity and each capable of conducting auxiliary drilling activity. The Court has construed "drilling

---

[5] Claim 8 covers a multi-activity drilling assembly as defined in Claim 6, which covers a multi-activity drilling assembly as defined in Claim 1. The quoted language is set forth in Claim 1 of the '071 Patent.

[6] As with the '071 Patent, Claim 8 of the '069 Patent covers a drillship as defined in Claim 6, which covers a drillship as defined in Claim 1. The relevant language is set forth in Claim 1 of the '069 Patent.

[7] Claim 18 of the '069 Patent covers a multi-activity drilling assembly as defined in Claim 17.

activity" to mean "operations required to construct a well," and has construed "auxiliary drilling activity" to mean "drilling operations removed from the critical path." *See Markman* Order, p. 35. Noble argues that it is entitled to summary judgment of non-infringement of these claims because its drilling stations perform only drilling activity, not "auxiliary drilling activity." Noble argues that all of the operations at its drilling stations are "on" – not removed from – the critical path and, therefore, are not "auxiliary drilling activity."

As explained above at pages 4-5 in connection with the Patents-in-Suit, where both stations on a drillship simultaneously perform drilling activities, the drilling activity requiring less time is considered "removed from the critical path" and becomes, by definition, "auxiliary drilling activity." Transocean has presented evidence that Noble's HHI Drillships can perform certain drilling operations from both the drilling station and the preassembly station. *See* Declaration of John Shaughnessy, Exh. 6 to Response, pp. 9-10; Second Declaration of John Shaughnessy, Exh. 3 to Surreply, p. 6. Transocean has presented evidence that this could be accomplished with "the equipment observed" by Transocean's expert during his inspection of an HHI Drillship. *See* Shaughnessy Declaration, p. 9. Specifically, Transocean has presented evidence that the HHI Drillship preassembly station is capable of "jetting 36 inch casing into the seabed" while the drilling station "has the capability to advance 22" casing, for use in the hole being drilled following the jetting

of the 36 inch casing." Second Shaughnessy Declaration, p. 6. Transocean has presented evidence that "[b]y doing so the [drilling] station removes the 22" casing operation from the critical path." *Id.* Transocean thus has presented evidence regarding the HHI Drillships that raises a genuine issue of material fact regarding whether those vessels have two stations each capable of conducting both drilling activity and auxiliary drilling activity as required by Claim 8 of the '071 Patent, Claim 1 of the '781 Patent, and Claims 8, 17 and 18 of the '069 Patent.

Transocean has failed to present similar evidence regarding the *Globetrotter* Drillship. Therefore, Transocean has not raised a genuine issue of material fact regarding Claim 8 of the '071 Patent, Claim 1 of the '781 Patent, and Claims 8, 17 and 18 of the '069 Patent as to that vessel. Noble's Motion for Summary Judgment of Non-Infringement on these claims is **denied** as to the HHI Drillships and **granted** as to the *Globetrotter* Drillship.

## V. CLAIM 30 ('781 PATENT), AND CLAIMS 1 AND 10 ('851 PATENT)

Claim 30 of the '781 Patent, an apparatus claim, covers:

> A multi-activity drilling assembly operable to be supported from a position above the surface of a body of water for conducting drilling operations into the bed of the body of water, said multi-activity drilling assembly including:
>   a drilling superstructure operable to be mounted upon a drilling deck
>       for simultaneously supporting drilling operations for a well and
>       operations auxiliary to drilling operations for the well;

first means connected to said drilling superstructure for advancing tubular members into the bed of body of water, wherein said first means includes a first means for hoisting tubular members;

second means connected to said drilling superstructure for advancing tubular members simultaneously with said first means into the body of water to the seabed, wherein said second means includes a second means for hoisting tubular members; and

means positioned adjacent to said first and second means for advancing tubular members for transferring tubular assemblies between said first means for advancing tubular members and said second means for advancing tubular members to facilitate simultaneous drilling operations auxiliary to said drilling operations, wherein drilling activity can be conducted for the well from said drilling superstructure by said first means for advancing tubular members and auxiliary drilling activity can be simultaneously conducted for the well from said drilling superstructure by said second means for advancing tubular members.

Claim 30, '781 Patent. Claims 1 and 10 of the '851 Patent include similar limitations. Noble argues that it is entitled to summary judgment of non-infringement on each of these claims because its drillships (1) lack the structural capability of advancing tubular members to the seabed, and (2) are not capable of simultaneous drilling and auxiliary drilling operations.[8]

Noble argues that its drillships are not capable of advancing tubular members to the seabed because they do not have motion compensation equipment. The Court previously construed the means-plus-function term "means for advancing tubular

---

[8] As discussed in the prior section, Transocean has presented evidence that the HHI Drillships are capable of simultaneous drilling and auxiliary drilling activity, but has failed to present such evidence for the *Globetrotter* Drillship. Therefore, Noble is entitled to summary judgment of non-infringement on these claims as to the *Globetrotter* Drillship.

members to the seabed" as requiring a structure of "hoisting equipment including drawworks, sheaves, a traveling block and structural equivalents capable of" advancing tubular members to the seabed. *See Markman* Order, p. 34. Motion compensation equipment is not a required element of the corresponding structure for the claim term as construed by the Court. Indeed, during claim construction briefing and during the *Markman* hearing, Transocean expressed its concern that Noble intended to argue that "means for advancing" requires "the unrelated function of motion compensation." *See, e.g.*, Transocean's Reply Claim Construction Brief [Doc. # 54]. pp. 8-9. Noble assured the Court that it was not arguing that motion compensation was a required element of the corresponding structure. *See Markman* Transcript [Doc. # 66], p. 65. Noble represented that it would, instead, argue only that the structure must be capable of advancing tubular members to the seabed. *See id.* at 65-67. Therefore, the Court will entertain only the argument that Noble's Drillships do not infringe the Patents-in-Suit because they are factually incapable of advancing tubular members to the seabed, not the argument that they do not infringe as a matter of law because they do not include the structural component of motion compensation.

Noble notes that Transocean's technical expert, Calvin Barnhill, previously stated to the Patent Office that motion compensation is "a necessary element" for extending a tubular member to the seafloor from a floating rig. *See* Motion, pp. 4-5 (citing Barnhill Declaration [Doc. # 76-1], ¶ 58). Noble cites other instances where

Transocean made representations regarding the use of motion compensation. *See* Reply [Doc. # 83], pp. 13-15. As a result, in its Motion for Summary Judgment of Non-Infringement, Noble asserts "principles of disclaimer, estoppel, and basic fairness" based on the prior statements by Transocean regarding motion compensation. *See* Motion, p. 24. These doctrines do not assist Noble here. Principles of prosecution disclaimer are applicable only at the claim construction phase, not at the infringement analysis phase. *See, e.g., Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013). During the *Markman* hearing, Noble disavowed any estoppel argument regarding motion compensation. *See Markman* Transcript, pp. 68-69. Instead, Noble argued that motion compensation was required "in some instances" to perform the function of advancing tubular members to or into the seabed. *See id.* at 66. Last, Noble has not shown that "basic fairness" is a legal basis for granting summary judgment of non-infringement in its favor. Therefore, Noble's assertion of "principles of disclaimer, estoppel, and basic fairness" is unpersuasive.

In its Reply, Noble argues that judicial estoppel prevents Transocean from arguing that a drillship station without motion compensation is capable of advancing tubular members to or into the seabed. *See* Reply, p. 16. This precise argument, raised for the first time in Noble's Reply, would require a change to the Court's prior claim construction ruling – something neither party has requested. Based on Noble's

*Markman* phase contentions, the Court construed the means-plus-function claim term "means for advancing" to require a certain structure that did not specifically require motion compensation equipment. None of Noble's arguments persuade the Court to preclude Transocean from presenting evidence regarding whether Noble's drillships have two stations, each capable of advancing tubular members to the seabed.

Transocean has presented ample evidence that a drillship without motion compensation equipment is capable of advancing tubular members to the seabed, particularly in the Gulf of Mexico. Indeed, Noble's expert, Charles Jones, testified during his deposition that drillships in the Gulf of Mexico are capable of advancing tubular members to and into the seabed without the assistance of motion compensation equipment.[9] *See* Jones Depo., Exh. 3 to Response, pp. 73-75. Because Transocean has presented evidence that raises a genuine issue of material fact regarding whether the preassembly stations on Noble's HHI Drillships are capable of advancing tubular members to the seabed, summary judgment on Claim 30 of the '781 Patent and Claims 1 and 10 of the '851 Patent is **denied** as to those vessels.

---

[9] In its Reply, Noble argues that Jones was discussing a drillship operating without motion compensation, not a drillship that did not have motion compensation equipment available. *See* Reply, pp. 24-25. Jones's testimony demonstrates that a drillship has the ability to advance tubular members to and into the seabed without the assistance of motion compensation equipment. Whether or not the drillship has motion compensation equipment onboard, but not in use, does not alter that ability.

## VI. CONCLUSION AND ORDER

Based on the foregoing, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment of Non-Infringement [Doc. # 76] is **DENIED** as to Claim 37 of the '071 Patent, which is asserted only as to the *Globetrotter* Drillship. It is further

**ORDERED** that Defendants' Motion as to Claim 8 of the '071 Patent, Claim 1 of the '781 Patent, and Claims 8, 17 and 18 of the '069 Patent is **DENIED** as to the HHI Drillships and **GRANTED** as to the *Globetrotter* Drillship. It is further

**ORDERED** that Defendants' Motion as to Claim 30 of the '781 Patent and Claims 1 and 10 of the '851 Patent is **DENIED** as to the HHI Drillships and **GRANTED** as to the *Globetrotter* Drillship. It is further

**ORDERED** that counsel shall appear before the Court on **March 12, 2019, at 10:00 a.m.** for a status and scheduling conference in light of the recently amended complaint.

SIGNED at Houston, Texas, this **25th** day of **February, 2019**.

_____
NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE