United States District Court
Southern District of Texas
**ENTERED**
April 02, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC., | § § § § |
| Plaintiff, | § |
| VS. | §  CIVIL ACTION NO. 4:17-CV-123 |
| | § |
| NOBLE CORPORATION PLC, *et al*, | § § |
| Defendants. | § § |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are cross-motions for summary judgment on the breach-of-contract claim pled by the plaintiff, Transocean Offshore Deepwater Drilling, Incorporated ("Transocean"). Having considered the summary judgment record, the other filings in the case, and the parties' excellent briefing and oral argument regarding the novel issues raised therein, the Court will **DENY** both motions (Dkt. 132 and Dkt. 133).

### I.  BACKGROUND

This lawsuit began as a straightforward patent infringement case in which Transocean sued the defendants (a group of related entities[1] to which the Court will refer collectively as "Noble") alleging that five of the defendants' dual-activity offshore drillships infringed on four of Transocean's patents relating to dual-activity offshore drilling rigs ("the patents-in-suit"). However, during the parties' briefing and motion practice regarding claim-construction and infringement issues, a separate but related

---

[1] The entities are Noble Corporation, Noble Drilling Americas LLC, Noble Drilling Exploration Company, Noble Drilling Holding LLC, Noble Drilling Services Inc., Noble Drilling (U.S.) LLC, and Noble Drilling (U.S.) Inc.

1 / 20

matter that had apparently been lurking in the background since the beginning of the lawsuit emerged. Transocean amended its complaint to allege that Noble had breached a no-challenge clause contained in a license agreement that settled a different patent infringement case between Transocean and Noble ("the license agreement") (Dkt. 94; Dkt. 133-1). For the alleged breach of contract, Transocean seeks $11 million, plus interest, in liquidated damages (Dkt. 94 at p. 14).

Transocean and Noble signed the license agreement in 2007 after Transocean filed a lawsuit alleging that a Noble drillship called the *Clyde Boudreaux*—which, to be clear, is not one of the drillships at issue in this case—infringed the patents-in-suit. *See* Southern District of Texas case number 4:07-CV-618 at Dkt. 1. Emails contained in the summary judgment record in this case indicate that, when the parties signed the license agreement to settle the *Clyde Boudreaux* lawsuit, Transocean discounted its normal initial licensing fee from $15 million to $4 million in exchange for a no-challenge promise from Noble (Dkt. 138-3 at p. 2). According to the emails, the $11 million liquidated damages figure contained in the no-challenge clause represents that discount (Dkt. 138-3 at p. 2). The no-challenge clause constitutes Section 4.3 of the license agreement, and it reads:

> Noble Licensee covenants that it will not participate as a party or financially support a third party in any administrative or court proceeding or effort in the world to invalidate, oppose, nullify, reexamine, reissue or otherwise challenge the validity, enforceability, or scope of any claim of the Licensed Patents. Breach of this section 4.3 shall be considered a material breach which may not be cured under section 5.2. If Noble Licensee breaches this section 4.3, then Noble must pay Transocean an additional eleven million dollars ($11,000,000) plus interest accumulating since the Effective Date of this Agreement.
> Dkt. 133-1 at p. 5; Dkt. 94 at p. 8.

Transocean alleges that Noble's actions in this lawsuit have breached the no-challenge clause's prohibition against "challeng[ing] the . . . scope of any claim of the" patents-in-suit (Dkt. 132 at p. 6). Transocean alleges three specific breaches:

(1) In the briefing on its motion for summary judgment on the basis of noninfringement, Noble, citing instances in which Transocean allegedly distinguished prior art by claiming that floating rigs need motion compensation equipment to advance tubular members to the seabed, argued that "the principles of disclaimer, estoppel, and basic fairness" should prevent Transocean from arguing in this lawsuit that a floating rig without motion compensation equipment is capable of advancing tubular members to the seabed (Dkt. 76 at pp. 24–27; Dkt. 83 at pp. 16–21).

(2) In its claim-construction briefing, Noble argued that the phrase "to the seabed and into the body of water to the seabed" in claim 17 of one of the patents-in-suit was "nonsensical" and should be construed to mean "to the seabed and into the bed of the body of water," a proposed construction that Transocean contends was an attempt to narrow the scope of the claim (Dkt. 53 at pp. 32–34).

(3) In the briefing on its motion for summary judgment on the basis of noninfringement, Noble, citing instances in which Transocean allegedly distinguished prior art by differentiating preassembly of tubular string portions from drilling activities and operations, argued that "the preassembly of tubular string portions is not itself a drilling activity [or a] drilling operation" (Dkt. 76 at pp. 14–20; Dkt. 83 at pp. 10–15; Dkt. 116 at pp. 8–14).

Neither the license agreement nor the balance of the summary judgment record contains any language clarifying what the license agreement means when it refers to "challeng[ing] the . . . scope" of a patent claim. No helpful definitions are provided in the license agreement; and the emails in the summary judgment record discussing the license agreement never mention challenges to the scope of claims, even though they contain passages specifically addressing challenges to patent validity and enforceability. For

instance, with regard to the consent judgment that terminated the *Clyde Boudreaux* litigation, Transocean's counsel wrote to Noble's counsel that "Transocean believes a consent judgment ensures that patent *validity and enforceability* will not be litigated again with respect to the Clyde Boudreaux or any subsequent dual activity rig" (Dkt. 138-3 at p. 2) (emphasis added). In the same email, Transocean's counsel wrote of the no-challenge clause's liquidated damages provision that "[t]he $11M payment for challenging *validity* is based upon a discount of the normal initial payment of $15M" (Dkt. 138-3 at p. 2) (emphasis added). In other words, even when supplemented by summary judgment evidence shedding light on the parties' negotiations, the license agreement does not clearly establish the parameters of the conduct prohibited by the "challenge the . . . scope of any claim" language in the no-challenge clause. Nevertheless, each party seeks judgment in its favor regarding Transocean's claims for breach of the license agreement as a matter of law under Federal Rule of Civil Procedure 56.

## II. THE APPLICABLE LEGAL STANDARDS

### A. Rule 56

In deciding a motion for summary judgment under Federal Rule of Civil Procedure 56, the Court must determine whether the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations omitted). In deciding whether a genuine and material fact issue has been created, the Court must review the facts and the inferences to be drawn from those facts in the light most favorable to the non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

## B. Choice of law

First the Court must decide which body of law to apply to Transocean's breach of contract action. Even though this lawsuit contains claims for patent infringement, the claim at issue in these cross-motions for summary judgment is an action for breach of the license agreement's no-challenge clause. "Generally, interpretation of a settlement agreement is not an issue unique to patent law, even if arising in the context of a patent infringement suit[,] . . . [and the Federal Circuit] appl[ies] the law of the appropriate regional circuit" to interpretation of the agreement. *Novamedix, Ltd. v. NDM Acquisition Corp.*, 166 F.3d 1177, 1180 (Fed. Cir. 1999). In an action brought specifically for breach of a settlement agreement, typically "[t]he question of interpretation is . . . governed not by federal patent law, but by state contract law" because the "grounds for decision are based on state contract law." *Gjerlov v. Schuyler Labs., Inc.*, 131 F.3d 1016, 1020 (Fed. Cir. 1997). Under those general choice-of-law rules, Texas and Fifth Circuit law would govern Transocean's breach of contract action and the interpretation of the "challenge the . . . scope of any claim" language in the no-challenge clause. *Sanofi-Aventis v. Apotex Inc.*, 659 F.3d 1171, 1178 (Fed. Cir. 2011); *see also Gjerlov*, 131 F.3d at 1020–22 (holding that Iowa contract law governed interpretation of the terms "glucose" and "Iowa

State University Testing Laboratories" in an appeal from the district court's grant of a motion to enforce a settlement agreement that had resolved a patent infringement case); *Interspiro USA, Inc. v. Figgie International Inc.*, 18 F.3d 927, 931 (Fed. Cir. 1994) (holding that "[i]nterpretation of an agreement presents a question of law, governed by state contract law" and that New York law accordingly governed interpretation of the contractual provisions controlling royalty calculation in an appeal from the district court's grant of a motion to enforce a settlement agreement that had resolved a patent infringement case).

So, does this general rule also apply to breach of contract claims stemming from no-challenge clauses in a settlement agreement? It appears the answer is "might" and "depends." Nine years ago, the Federal Circuit held that it lacked jurisdiction over the appeal of a breach of contract lawsuit in which one party to a settlement agreement that had resolved a patent infringement dispute sued the other parties for violating the settlement agreement's no-challenge clause—a holding consistent with the notion that breach of contract actions stemming from no-challenge clauses do not present an issue governed by Federal Circuit law. *Rates Technology, Inc. v. Speakeasy, Inc.*, 437 Fed. App'x 940, 940–41 (Fed. Cir. 2011) (transferring appeal to the Second Circuit); *see also Rates Technology, Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 164–67 (2d Cir. 2012), *cert. denied*, 568 U.S. 1122 (2013) (providing factual background). However, two prior opinions by the Federal Circuit demonstrate that the choice of law analysis is not always quite this simple. In both of those cases the Federal Circuit applied its own law to resolve

settlement agreement disputes.² In *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362 (Fed. Cir. 2001), and *Baseload Energy, Inc. v. Roberts*, 619 F.3d 1357 (Fed. Cir. 2010), the Federal Circuit held that the issue of "whether public policy precluding patent license estoppel should extend to a waiver of validity challenges in a settlement agreement" was "intimately related with the substance of enforcement of a patent right" and consequently applied its own law in examining whether particular contractual waivers contained in settlement agreements barred invalidity and unenforceability defenses. *Flex-Foot*, 238 F.3d at 1365; *Baseload*, 619 F.3d at 1361. *Rates Tech*, on the one hand, with *Flex-Foot* and *Baseload*, on the other, can be understood by highlighting the different types of claims at issue: *Rates Tech* involved breach of contract claims but not patent infringement claims, while *Flex-Foot* and *Baseload* involved patent infringement claims³ but not breach of contract claims, so *Rates Tech* had a far more tangential relationship to the enforcement of patent rights.

This lawsuit does not comfortably fit under the facts of either *Flex-Foot* or *Rates Tech*, though, because it intertwines both types of claims. Transocean has sued Noble for breaching the no-challenge clause by taking certain actions to defend against Transocean's allegations of patent infringement, and Transocean has added the breach of contract claims to the ongoing patent infringement lawsuit. As a result, "[i]t is somewhat

---

² Neither of these holdings was expressly overruled by the court in *Rates Tech.*
³ To be precise, *Flex-Foot* involved an arbitration proceeding in which the alleged infringer attempted to raise an invalidity defense, and *Baseload* involved a preemptive declaratory judgment action in which a licensee, unable either to secure financing for the licensing fee or to develop its technology without risking an infringement suit, sought a judicial declaration that the licensor's patent was invalid and unenforceable. *Flex-Foot*, 238 F.3d at 1364; *Baseload*, 619 F.3d at 1359–60. For the purposes of this choice-of-law analysis, there is no material distinction between those procedural postures and that of a typical federal lawsuit for patent infringement.

unclear whether state or Federal Circuit law should apply in interpreting the settlement agreement in this case." *Certusview Technologies, LLC v. USIC, LLC*, No. 2:14-CV-373, 2014 WL 12591937, at *10 n.7 (E.D. Va. Dec. 15, 2014) (discussing the tension between the choice-of-law rule stated in *Baseload* and the choice-of-law rule stated in *Gjerlov*).

To harmonize Federal Circuit law with Texas and Fifth Circuit law, the Court must split the interpretation of the license agreement's no-challenge clause into two inquiries:

(1) Is the no-challenge clause enforceable as a matter of public policy?; and

(2) If so, can the no-challenge clause be construed as a matter of law?

The first inquiry is guided by Federal Circuit law; the second, by state and regional circuit law. As discussed above, "[b]ecause the interpretation of a settlement agreement is not an issue unique to patent law," the Federal Circuit generally interprets settlement agreements by "apply[ing] the law of the appropriate regional circuit[,]" *Sanofi-Aventis*, 659 F.3d at 1178, and "state contract law." *Gjerlov*, 131 F.3d at 1020. To the extent that *Flex-Foot* and *Baseload* have begun to carve out an exception to the Federal Circuit's general choice-of-law rules regarding the interpretation of settlement agreements, the parameters of that exception, so far, are that Federal Circuit law will determine whether a contractual waiver of claims is "clear and unambiguous" enough to strike a proper balance between the public policy concerns of permitting full and free competition in the use of ideas and encouraging the settlement of patent litigation—i.e., whether it is clear and unambiguous enough to be enforceable as a matter of public policy. *Baseload*, 619 F.3d at 1361–62. *Flex-Foot* and *Baseload* do not explain, however,

what should happen when a no-challenge clause meets the *Baseload/Flex-Foot* public-policy standard but nevertheless requires further construction to determine liability for a breach of the clause. In such circumstances, a trial court must, pursuant to *Baseload* and *Gjerlov,* utilize state and regional circuit law to construe the no-challenge clause and determine the parties' intent.

### C. Enforceability under Federal Circuit law

Under Federal Circuit precedent, a settlement agreement or consent decree that resolves a patent infringement case can bar patent claims and defenses in future infringement actions "if the language of the agreement or consent decree is clear and unambiguous." *Baseload*, 619 F.3d at 1361–62. "In the context of settlement agreements, as with consent decrees, clear and unambiguous language barring the right to challenge patent validity in future infringement actions is sufficient, even if invalidity claims had not been previously at issue and had not been actually litigated." *Id*. at 1363. "However, any surrender of the right to challenge validity of a patent is construed narrowly." *Diversey Lever, Inc. v. Ecolab, Inc.*, 191 F.3d 1350, 1352 (Fed. Cir. 1999). "Each case must be examined on its own facts in light of the agreement between the parties." *Baseload*, 619 F.3d at 1363.

### D. Contract construction under Texas law

When construing a contract, courts applying Texas law "must ascertain and give effect to the parties' intentions as expressed in the writing itself." *El Paso Field Services, L.P. v. MasTec North America, Inc.*, 389 S.W.3d 802, 805 (Tex. 2012). The Court must first determine whether the contract "is so worded that it can be given a certain or definite

legal meaning or interpretation[;]" if it is, "then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Deciding whether a contract is ambiguous is a question of law for the Court. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). The Court must decide the question of ambiguity "by examining the contract as a whole in light of the circumstances present when the contract was entered." *Anglo-Dutch Petroleum International, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 449–50 (Tex. 2011); *see also Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731–32 & n.5 (Tex. 1981) (holding that "the proper rule" of contract construction is that "the court must first consult surrounding circumstances to determine whether or not the contract is ambiguous"). When examining the contract, the Court must be mindful that even:

> [i]n interpreting contracts or clauses set forth in "clear and unambiguous" language, the courts do not confine themselves to a mere inspection of the document. Before committing themselves, the courts carefully examine the surrounding circumstances, prior negotiations, and all other relevant incidents bearing on the intent of the parties. Only after a careful and painstaking search of all the factors shedding light on the intent of the parties, only after "turning signs and symbols into equivalent realities" will the court conclude that the language in any given case is "clear and unambiguous."
> 
> *Sun Oil*, 626 S.W.2d at 731 n.5 (ellipses, parenthetical phrases, and citation omitted) (quoting 4 Williston on Contracts Section 600A).

"If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing." *Id.* at 731. But "if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact

issue on the parties' intent." *Davidson*, 128 S.W.3d at 229; *see also Coker*, 650 S.W.2d at 393–94 ("A contract . . . is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning."). When a contract is ambiguous, the Court may consider the parties' interpretations and admit extraneous parol evidence[4] to determine the true meaning of the instrument. *National Union Fire Insurance Co. of Pittsburgh, PA v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).

A term left poorly defined or altogether undefined by a contract can create an ambiguity in that contract. *See, e.g., Quality Infusion Care, Inc. v. Health Care Service Corp.*, 224 S.W.3d 369, 379–80 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("This case involves the meaning of the contractual term 'Provider.' . . . Based on the language employed, neither QIC's interpretation of the contract nor that of appellees is any less reasonable."); *Healthcare Cable Systems, Inc. v. Good Shepherd Hospital, Inc.*, 180 S.W.3d 787, 791–92 (Tex. App.—Tyler 2005, no pet.) ("[F]rom our reading of the sentence by which the parties intended to define the term 'Operational Date,' we conclude that the term is fairly susceptible of more than one construction."). To avoid that outcome, "Texas courts often resort to the use of external references such as dictionaries to determine [a contractual] term's plain, ordinary, and generally accepted

---

[4] Distinguishing "evidence of surrounding circumstances," which may be considered when a contract is unambiguous, from "parol evidence," which may not, can be extremely difficult. The Texas Supreme Court has helped to sharpen the dividing line by explaining that the parol evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011). Such "surrounding circumstances" include "the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties." *Id*. (quotation marks omitted).

meaning." *Mescalero Energy, Inc. v. Underwriters Indemnity General Agency, Inc.*, 56 S.W.3d 313, 320 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). "In particular, a specialized industry or trade term may require extrinsic evidence of the commonly understood meaning of the term within a particular industry." *Id.*; *see also, e.g., Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121–22 (Tex. 1996) ("[W]e find that applying the trade meaning of royalty and market value at the well renders the post-production clauses surplusage as a matter of law. . . . Royalty is commonly defined as the landowner's share of production, free of expenses of production[, and m]arket value at the well has a commonly accepted meaning in the oil and gas industry."); *Ramsay v. Maryland American General Insurance Co.*, 533 S.W.2d 344, 346 (Tex. 1976) ("Most of the insurance cases from other states involving this same exclusionary provision apply this meaning of 'commercial.'"). But even the meaning of a technical term can present a jury question if reference to extrinsic evidence does not yield a settled definition. *Mescalero*, 56 S.W.3d at 318, 322–25 (holding that summary judgment was inappropriate when "a commonly cited oil and gas dictionary" established one reasonable definition of the term "formation" and the affidavit of an expert with "extensive education and experience in the oil and gas industry" established another reasonable definition); *Startex Drilling Co., Inc. v. Sohio Petroleum Co.*, 680 F.2d 412, 415–17 (5th Cir. 1982) (applying Texas law) (holding that the district court properly submitted the case to the jury when the parties "presented plausible evidence to support their differing versions as to the meaning and effect" of the terms "loss of circulation" and "normal circulation") ("[T]he undefined technical terms on which the contract's application to the present

dispute depends convey little meaning without explanation. . . . Thus, it was proper to submit to the jury the evidence from both sides as to the meaning attached to these technical terms by the parties, and by the industry.").

III. **ANALYSIS**

Applying the legal standards outlined above to the license agreement's no-challenge clause, the Court finds that the no-challenge clause is clear enough to be enforceable as a matter of public policy but not clear enough to be construed as a matter of law. Accordingly, Transocean's breach of contract action, and the construction of the "challenge the . . . scope of any claim" language in the no-challenge clause, must be submitted to the jury.

### a. Is the no-challenge clause enforceable?

Under Federal Circuit precedent, the license agreement's no-challenge clause is enforceable as a matter of public policy. In relevant part, the clause reads:

> Noble Licensee covenants that it will not participate as a party or financially support a third party in any administrative or court proceeding or effort in the world to invalidate, oppose, nullify, reexamine, reissue or otherwise challenge the validity, enforceability, or scope of any claim of the Licensed Patents.
> Dkt. 133-1 at p. 5; Dkt. 94 at p. 8.

The closest analogues to this language in the Federal Circuit caselaw appear to be clauses in the settlement agreements discussed in *Diversey* and *Flex-Foot*. In *Diversey*, the parties settled a patent infringement lawsuit, and the settlement agreement provided that the accused infringer would not "directly or indirectly aid, assist, or participate in any action contesting the validity" of the patents at issue. *Diversey*, 191 F.3d at 1351–52.

Later, the patent holder sued the accused infringer again for patent infringement over different products that indisputably infringed on the same patents. *Id*. The Federal Circuit affirmed a summary judgment in favor of the patent holder, holding that the accused infringer, by entering into the prior settlement agreement, had "waive[d] . . . the invalidity defense as to future accused products" and "surrendered its right to challenge the validity of the patents in any context." *Id*. In *Flex-Foot*, the parties settled two patent-related lawsuits. The settlement agreement in the second lawsuit provided that the accused infringer would not "challenge or cause to be challenged, directly or indirectly, the validity or unenforceability, or scope of the [patents] in any court or tribunal, or before the United States Patent and Trademark Office or in any arbitration proceeding." *Flex-Foot*, 238 F.3d at 1364. Additionally, the settlement agreement in the second lawsuit provided that the accused infringer "waive[d] any and all invalidity and unenforceability defenses in any future litigation, arbitration, or other proceeding." *Id*. When a third lawsuit between the parties went to arbitration, the accused infringer attempted to raise an invalidity defense. *Id*. The district court rejected the accused infringer's attempt to raise the invalidity defense and granted the patent holder's motion to confirm the arbitration award in the patent holder's favor. *Id*. In affirming the district court, the Federal Circuit held that the accused infringer had voluntarily executed a "clear and unambiguous waiver of future challenges to the validity of the [patent]" and was therefore "contractually estopped from challenging the validity of the [patent.]" *Id*. at 1370.

Here, Transocean and Noble settled a patent infringement lawsuit involving the patents-in-suit by entering into the license agreement. In the license agreement's no-

challenge clause, Noble agreed that "it w[ould] not participate as a party or financially support a third party in any administrative or court proceeding or effort in the world to . . . challenge the . . . scope of any claim of the [patents-in-suit]" (Dkt. 133-1 at p. 5; Dkt. 94 at p. 8). Under *Diversey* and *Flex-Foot*, the no-challenge clause is clear and unambiguous enough to waive future challenges to the scope of any claim of the patents-in-suit.

### b. Can the no-challenge clause be construed as a matter of law?

Unfortunately, while it is clear that Noble waived the right to challenge the scope of the claims of the patents-in-suit in the license agreement, the meaning of the language "challenge the . . . scope of any claim" is uncertain and doubtful, and the language is reasonably susceptible to more than one meaning. The Court holds that the language is ambiguous under Texas law.

Transocean alleges three specific breaches of the license agreement's bar on future challenges to claim scope:

> (1) In the briefing on its motion for summary judgment on the basis of noninfringement, Noble, citing instances in which Transocean allegedly distinguished prior art by claiming that floating rigs need motion compensation equipment to advance tubular members to the seabed, argued that "the principles of disclaimer, estoppel, and basic fairness" should prevent Transocean from arguing in this lawsuit that a floating rig without motion compensation equipment is capable of advancing tubular members to the seabed (Dkt. 76 at pp. 24–27; Dkt. 83 at pp. 16–21).
>
> (2) In its claim-construction briefing, Noble argued that the phrase "to the seabed and into the body of water to the seabed" in claim 17 of one of the patents-in-suit was "nonsensical" and should be construed to mean "to the seabed and into the bed of the body of water," a proposed construction that Transocean contends was an attempt to narrow the scope of the claim (Dkt. 53 at pp. 32–34).

(3) In the briefing on its motion for summary judgment on the basis of noninfringement, Noble, citing instances in which Transocean allegedly distinguished prior art by differentiating preassembly of tubular string portions from drilling activities and operations, argued that "the preassembly of tubular string portions is not itself a drilling activity [or a] drilling operation" (Dkt. 76 at pp. 14–20; Dkt. 83 at pp. 10–15; Dkt. 116 at pp. 8–14).

Transocean contends that the no-challenge clause prohibits Noble from doing two things exemplified by those alleged breaches: (1) arguing that Transocean disavowed claim scope by distinguishing prior art (breaches one and three); and (2) proposing a construction of previously construed claim language that narrows the scope of the claim (breach two)[5] (Dkt. 132 at pp. 11–15). The license agreement's language and the summary judgment record do not conclusively affirm or refute Transocean's contention.

---

[5] With regard to alleged breach two, the parties vehemently disagree about whether the "to the seabed and into the body of water to the seabed" language had in fact been previously construed (Dkt. 136 at pp. 15–17; Dkt. 137 at pp. 27–29). It appears that, when this lawsuit was initiated, Judge Rosenthal had, in other cases, previously given other pertinent language in Claim 17 a construction that was inconsistent with Noble's proposed construction of "to the seabed and into the body of water to the seabed" in this case (Dkt. 137-3 at p. 3, 24, 37; Dkt. 137-4 at pp. 3, 23, 35). Regardless, in her claim construction ruling in this case, Judge Atlas found that Noble's proposed construction of "to the seabed and into the body of water to the seabed" deviated from the phrase's plain language:

> Noble argues that this is a typographical error and should read "into the bed of the body of water." Although the Court agrees that the phrase "to the seabed and into the body of water to the seabed" is redundant, a Court cannot correct a patent unless the error is evident from the face of the patent. The Court does not find that the questioned language, although duplicative, is an erroneous statement of the patent drafter's intent. Therefore, *the Court construes the language as written*. Further, there is insufficient indication that Noble's proposed construction is warranted. As a result, the Court concludes that the "second tubular advancing station" is an assembly of equipment that is capable of advancing tubular members to the seabed.
>
> . . .

As explained at the outset of this opinion, neither the license agreement nor the balance of the summary judgment record contains any language clarifying what the license agreement means when it refers to "challeng[ing] the . . . scope" of a patent claim. No helpful definitions are provided in the license agreement; and the emails in the summary judgment record discussing the license agreement never mention challenges to the scope of claims, even though they contain passages specifically addressing challenges to patent validity and enforceability. Moreover, the field of patent law is specialized and highly technical, yet the summary judgment record is devoid of extrinsic evidence showing the commonly understood meaning, if there is one, of the language "challenge the scope of patent claims" in agreements settling patent infringement lawsuits. *Flex-Foot* and *Diversey* provide some commercial context;[6] those opinions specifically discuss the invalidity and unenforceability defenses, which under 35 U.S.C. § 282 "shall be pleaded" if asserted, and consequently would lead the Court to definitively construe the license agreement as barring Noble from pleading invalidity and unenforceability defenses. But 35 U.S.C. § 282 does not mention claim scope, and no judicial opinion the Court could locate provides any interpretive help. The available contextual evidence simply does not

> There is no requirement that the second tubular advancing station in Claim 17 of the '069 patent have the capability of advancing tubular members "into" the seabed.
> Dkt. 68 at pp. 21–22 (emphasis added; some quotation marks and a citation removed).

On this summary judgment record, the language "challenge the scope of patent claims" in the no-challenge clause can reasonably be construed to prohibit proposing a construction that deviates from the plain language of a claim in a way that narrows the scope of that claim, even if the claim language had not been previously construed.
[6] The parties' execution of the license agreement predates *Baseload*. In any event, *Baseload* would not materially enhance the context already provided by *Flex-Foot* and *Diversey*.

answer the question of whether Noble's actions in this lawsuit constituted impermissible challenges to claim scope.

Since reference to the available contextual evidence does not yield a settled definition of the language "challenge the scope of patent claims," the meaning of the language is uncertain and doubtful, and the language is reasonably susceptible to more than one meaning. The parties' arguments confirm as much. Noble's interpretation of the no-challenge clause is strictly formalistic. According to Noble, the list of words—"invalidate, oppose, nullify, reexamine, [and] reissue"—immediately preceding the phrase "or otherwise challenge" in the no-challenge clause "references affirmative procedural efforts to change the legal status of Transocean's patents" (Dkt. 133 at p. 14). Noble gives as examples of such affirmative challenges a motion for summary judgment of invalidity of certain claims ("invalidate"); opposition proceedings filed before the European Patent Office ("oppose"); a foreign "nullity action" of the sort mentioned in *Albert v. Kevex Corp.*, 729 F.2d 757, 761 (Fed. Cir. 1984) ("nullify"); a request for reexamination under 35 U.S.C. § 302 ("reexamine"); and a protest against an application for reissue of a patent as discussed in *In re Mettke*, 570 F.3d 1356, 1358 (Fed. Cir. 2009) ("reissue") (Dkt. 133 at p. 14). Under the rule of *ejusdem generis*,[7] Noble argues, "'otherwise challenge' must refer to actions of the same kind as procedural efforts to

---

[7] Texas courts apply the statutory construction aid of *ejusdem generis* to the construction of contracts. *Barnett v. Aetna Life Insurance Co.*, 723 S.W.2d 663, 665–66 (Tex. 1987). The Texas Supreme Court has articulated the rule as follows: "When general words follow specific, enumerated categories, we limit the general words' application to the same kind or class of categories as those expressly mentioned." *City of Houston v. Bates*, 406 S.W.3d 539, 545 (Tex. 2013).

invalidate, oppose, nullify, reexamine, or reissue patents" (Dkt. 133 at p. 14). According to Noble, the term "challenge" could plausibly encompass, for instance, "*inter partes* review (IPR) petition procedures . . . , *amicus curiae* challenges, or special challenge procedures before foreign tribunals" but does not reach any of Noble's conduct in this lawsuit (Dkt. 133 at p. 15). Noble's interpretation of the license agreement's no-challenge clause is reasonable.

Transocean counters Noble's interpretation of the no-challenge clause by pointing out that the list of words—"invalidate, oppose, nullify, reexamine, [and] reissue"—immediately preceding the phrase "or otherwise challenge" in the no-challenge clause is "a list of *verbs*[,]" not an actual "list of *procedures*" (Dkt. 137 at p. 16) (emphasis in Transocean's brief). According to Transocean, Noble is improperly trying to cabin what was intended to be a "broader clause" designed "to streamline any and all future patent litigation between Transocean and Noble by preventing challenges to the claim scope of Transocean's patents" (Dkt. 137 at p. 21). Transocean argues that, under the no-challenge clause, "Noble was bound not to invoke doctrines designed for the express purpose of limiting the scope of claims that had already been construed in this or other cases or to take a position that is clearly inconsistent with the language of a prior construction" (Dkt. 137 at p. 18). Transocean notes that it provided substantial consideration for the no-challenge promise: when the parties signed the license agreement to settle the *Clyde Boudreaux* lawsuit, Transocean discounted its normal initial licensing fee from $15 million to $4 million in exchange for the no-challenge promise from Noble (Dkt. 132 at p. 5; Dkt. 138-3 at p. 2). Transocean's interpretation of the license agreement's no-

challenge clause is also reasonable. Although it seems highly unlikely that Noble would sign away the rights to engage in the conduct that led Transocean to sue it for breach of contract—particularly the right to cite statements made by Transocean after the parties executed the license agreement as evidence of claim scope disavowal—the language of the license agreement and the summary judgment record do not foreclose such an interpretation. In the end, neither party has established entitlement to judgment as a matter of law. Transocean's breach of contract claim will go to the jury.[8]

IV. **CONCLUSION**

The parties' motions for summary judgment (Dkt. 132 and Dkt. 133) are **DENIED**.

SIGNED at Houston, Texas, on April 2, 2020.

*[signature: George C. Hanks Jr.]*
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE

---

[8] In its response to Transocean's motion for summary judgment, Noble discusses the penalty defense to enforcement of the liquidated damages clause (Dkt. 136 at pp. 23–27). The Court holds that Noble waived its penalty defense. Under Texas law, the defense of penalty is an affirmative defense that, if not pled, is waived unless it is "apparent on the face of the [plaintiff's complaint] and established as a matter of law." *Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex. 1991). "The party asserting that a liquidated damages clause is an unenforceable penalty . . . bears the burden of proof." *GPA Holding, Inc. v. Baylor Health Care System*, 344 S.W.3d 467, 475 (Tex. 2011). Noble did not plead the penalty defense and has not shown that the defense is apparent on the face of Transocean's pleadings and established as a matter of law.